811 A.2d 310

**In re THOMAS J.**

**No. 67, Sept. Term, 2000.**

Court of Appeals of Maryland.

Nov. 19, 2002.

Mary Ann Ince, Assistant Attorney General (J. Joseph Curran, Jr., Attorney General of Maryland, on brief), for petitioner.

Geraldine K. Sweeney, Assistant Public Defender (Stephen E. Harris, Public Defender, on brief), for respondent.

Argued before BELL, C.J., ELDRIDGE, RAKER, WILNER, CATHELL, HARRELL and BATTAGLIA, JJ.

BELL, C.J.

The issue this case presents is whether the constitutional right to a speedy trial applies to juvenile proceedings, where, in this case, there was a delay of three years and four months between the detention of the juvenile and the subsequent adjudicatory hearing. The Circuit Court for Prince George's County, sitting as a juvenile court, found that there was no denial of the right to a speedy trial and, therefore, denied the motion to dismiss filed by Thomas J., the respondent. The Court of Special Appeals, following an independent constitutional appraisal of the undisputed facts, reversed, determining that Thomas J. had been denied his right to a speedy trial. We shall affirm.

I.

Evidence gathered during a police investigation of an attempted robbery led to the arrest of Thomas J. on January 18, 1996. Later that day, Thomas J. was released into the

custody of his mother ("Mrs. J.") pending further proceedings. Subsequently, a delinquency petition was filed on May 2, 1996, but because Mrs. J. and Thomas J. had moved, they did not receive the summonses issued on May 8, 1996. The summonses were reissued on two occasions, May 28, 1996 and May 30, 1996. As a result of the failed attempts at service by the State, the petitioner, a writ of attachment was issued on June 24, 1996. This writ was reviewed annually for three years, and finally returned on April 22, 1999—three years and four months after the arrest. At the adjudicatory hearing on May 20, 1999, Thomas J. filed a preliminary Motion to Dismiss, "based upon denial of a speedy trial."

The State argues that neither the Fourteenth, nor the Sixth Amendment is applicable to juvenile delinquency proceedings, in light of the Maryland Juvenile Causes Act ("MJCA"), *infra,* which already has in place rigid time limitations for the commencement of juvenile proceedings. Moreover, the State argues, Mrs. J. signed a form release requiring her to "immediately notify the Clerk of the Juvenile Court at the Court House, Upper Marlboro, Maryland of any new address for [her] or the child." She failed to do so and, thus, the State submits, the delay should be attributed to Thomas J.:

> "And the fact that there had been an outstanding writ, that is not attributable to us. We have absolutely no obligation to go out and find him. That is what a writ is for. That is what a bench warrant is for. In the adult system, we use the bench warrant. Bench warrants can be outstanding for years. And if they are served, they are served. Same thing with a writ. The writ works as a bench warrant in juvenile court."

Thomas J., of course, sees it much differently. Noting that the form release was not admitted into evidence, he disputes that Mrs. J. was notified of an affirmative duty to notify the clerk of the juvenile court of any change of address. Rather, Mrs. J. did what she reasonably could have by giving the detective in the case her phone number at work, notifying that same detective of her change of address, and also in notifying the post office of her change of address. Moreover, even after

the move, Thomas J. remained a student in the Prince George's County Public School System. Arguing that both the Fourteenth and Sixth Amendment of the United States Constitution should be applicable to juvenile proceedings, and that the delay should be attributed to the State, defense counsel stated:

"I am not aware of what efforts the State made to serve the respondent. But I would venture to guess that there were essentially none. Had the State's Attorney's Office contacted the detective, the detective could have contacted the mother. Had the State's Attorney's Office or their investigators gone to the school, they could have found this man, this respondent. So they are going to have to justify the reasons for why they did not serve the respondent."

Subsequently, Thomas J.'s Motion to Dismiss was denied. Consequently, Thomas J. noted an appeal to the Court of Special Appeals. The intermediate appellate court reversed the judgment of the trial court. *In re Thomas J.,* 132 Md.App. 396, 752 A.2d 699 (2000). Balancing the four factors set forth in *Barker v. Wingo,* 407 U.S. 514, 530, 92 S.Ct. 2182, 2191, 33 L.Ed.2d 101, 116 (1972) (assessing length of the delay, reasons for the delay, appellant's assertion of his right to a speedy trial, and prejudice to the appellant), that court, *In re Thomas J.,* at 404–12, 752 A.2d at 703–07, opined:

"This length of delay [of more than three years and four months] is especially egregious considering that the opportunity to rehabilitate and treat, the purpose of our juvenile justice system, was lost during some of the more formative years of Thomas's life."

\* \* \* \* \* \*

"[T]he record shows that the State made three attempts to summons Thomas and his mother, contrary to Thomas's contention that the State made only one attempt. Although we recognize that the State probably could have located Thomas and could have issued the writ of body attachment earlier, rather than allow it to remain outstanding for years, we do not find this case to be deliberate and knowing

inaction, but rather, 'less-than-diligent action.' ... Because the State was less than diligent in finding Thomas, we will weigh the Reasons for Delay factor against the State, although not heavily."

\* \* \* \* \* \*

"It is undisputed that Thomas never asserted his right to a speedy trial, but, rather made a motion to dismiss at the adjudicatory hearing on May 20, 1999. '[A] defendant's failure to demand a speedy trial during the period when he was unaware of the charge, cannot be weighed against him.' *Brady v. State*, 288 Md. 61, 69, 415 A.2d 1126, [1130] (1980)."

\* \* \* \* \* \*

"[I]n this case, Thomas was suddenly detained for an incident that occurred more than three years before. We place particular emphasis on the fact that Thomas was fourteen years of age when the incident occurred and he was served with the writ at the age of seventeen. As we noted above, these three years are some of the most formative years in a person's life. For a teenager, three years and four months may seem a lifetime.... We therefore find that Thomas suffered at least some prejudice beyond mere anxiety.... [And moreover,] we find that the delay of over three years reached that critical point of being a 'substantial' delay where a presumption of prejudice arose."

We then granted the Petitioner's Petition for Writ of Certiorari, *In re Thomas J.*, 360 Md. 485, 759 A.2d 230 (2000), to address this case of first impression.

## II.

### A.

We have previously noted that while "juvenile proceedings are civil and not criminal in nature, this does not mean that a juvenile gives up all rights that a person would be entitled to in a criminal proceeding." *In re Anthony R.*, 362 Md. 51, 69, 763 A.2d 136, 146 (2000). The respondent adopts

this premise and asserts (i) a speedy trial claim based on the Due Process Clause of the Fourteenth Amendment to the United States Constitution and Article 24 of the Maryland Declaration of Rights; and (ii) a speedy trial claim based on the Sixth Amendment to the United States Constitution and Article 21 of the Maryland Declaration of Rights.

The Sixth Amendment to the United States Constitution contains protections specifically granted to a criminal defendant in a criminal prosecution. Therefore, those rights are properly asserted by an accused in a criminal prosecution. The Supreme Court has been reluctant to transfer wholesale all the rights specifically granted to the criminal defendant to the juvenile offender. *See McKeiver v. Pennsylvania,* 403 U.S. 528, 545, 91 S.Ct. 1976, 1986, 29 L.Ed.2d 647, 661 (1971) ("[t]he Court has refrained ... from taking the easy way with a flat holding that all rights constitutionally assured for the adult accused are to be imposed upon the state juvenile proceeding."); *See also In re Gault,* 387 U.S. 1, 30, 87 S.Ct. 1428, 1445, 18 L.Ed.2d 527, 548 (1967); *Kent v. United States,* 383 U.S. 541, 562, 86 S.Ct. 1045, 1057, 16 L.Ed.2d 84, 97 (1966) ("we do not mean ... that the hearing to be held must conform with all of the requirements of a criminal trial"). Consequently, any federal constitutional relief Thomas J. is afforded must stem from a violation of his due process rights protected by the Fourteenth Amendment.

This Court has also refrained from holding that all rights granted to a criminal defendant, under the Maryland Constitution, statutes, and common law, are applicable in juvenile proceedings. Nevertheless, our approach has differed somewhat from that of the Supreme Court. Usually, instead of focusing on the more general protections under Article 24 of the Maryland Declaration of Rights, the Maryland cases have determined whether a juvenile proceeding should be treated as a criminal prosecution for purposes of a specific right guaranteed by Maryland law. *See, e.g., In re Michael W.,* 367 Md. 181, 185, 786 A.2d 684, 687 (2001) ("[F]or purposes of the double jeopardy prohibition, a juvenile delinquency proceeding

is treated as a criminal prosecution"); *In re Parris W.*, 363 Md. 717, 724 n. 1, 770 A.2d 202, 206 n. 1 (2001) ("[W]e are aware of no cases that have interpreted the scope of the right to counsel in juvenile proceedings, including the effective assistance of counsel, any differently because of the origin of the right"); *In re Anthony R.*, 362 Md. 51, 76, 763 A.2d 136, 150 (2000) ("[W]e hold that the statute of limitations applicable to adult criminal misdemeanor offenses is likewise applicable to juvenile offenses in delinquency actions"); *In re Montrail M.*, 325 Md. 527, 532–538, 601 A.2d 1102 (1992) (The doctrine of merger under Maryland law, applicable in criminal cases, is also applicable in juvenile delinquency cases); *In re William A.*, 313 Md. 690, 698, 548 A.2d 130, 133–134 (1988) (The common law infancy defense is available in juvenile delinquency proceedings, as such " 'juvenile proceedings ... are criminal in nature,' " *quoting State v. Q. D.*, 102 Wash.2d 19, 23, 685 P.2d 557, 560 (1984)). *See also Berryman v. State*, 94 Md. App. 414, 420, 617 A.2d 1120, 1123 (1993) (The "right to a speedy trial [in juvenile proceedings] is also guaranteed by Art. 21 of the Maryland Declaration of Rights"); *In re Darryl D.*, 66 Md.App. 434, 440, 504 A.2d 676, 678 (1986), *affirmed*, 308 Md. 475, 520 A.2d 712 (1987). Accordingly, the state constitutional issue in this case is whether the right to a speedy trial, guaranteed by Article 21 of the Maryland Declaration of Rights, is applicable to juvenile delinquency proceedings.

The State, however, argues that any rights afforded Thomas J. are sufficiently contained in the MJCA, Md.Code (1974, 1998 Repl.Vol., 2000 Supp.), Courts and Judicial Proceedings Article, § 3–801 *et seq.* and Md. Rule 11–114.[1] In

---

1. Section 3–810(p), in pertinent part, provides:
 "(p) *Time for filing complaint.*—(1) Except as provided in paragraph (2) of this subsection, within 15 days after a law enforcement officer takes a child into custody the law enforcement officer shall file a complaint with an intake officer."
 After the complaint is filed, § 3–810(d) provides:
 "(d) *Authorization decision.*—(1) The intake officer or the local department may authorize the filing of a petition if, based upon the

theory, the statutory scheme provided by the MJCA and Rule 11–114 ought to provide Thomas J. with sufficient protection against any delay of considerable length, but it does not do so. Section 3–812(d) of the MJCA provides that the juvenile "procedures to be followed by the court, shall be specified in the Maryland Rules." In turn, the applicable Rule, Md. Rule

complaint and the inquiry, the intake officer or the local department concludes that the court has jurisdiction over the matter and that judicial action is in the best interests of the public or the child."
Once authorized, a petition should be filed in the following manner, in accord with § 3–812(b) and (d):

"(b) *Petitions alleging delinquency or violation of § 3–831.*—Petitions alleging delinquency or violation of § 3–831 of this subtitle shall be prepared and filed by the State's Attorney. A petition alleging delinquency shall be filed within 30 days after the receipt of a referral from the intake officer, unless that time is extended by the court for good cause shown. Petitions alleging that a child is in need of supervision shall be filed by the intake officer. Petitions alleging that a child is in need of assistance shall be filed by the local department. If the local department does not file the petition, the person or agency that made the complaint to the local department may submit the denial to the Department of Juvenile Justice Area Director for filing. "(d) *Applicability of Maryland Rules.*—The form of petitions, peace order requests, and all other pleadings, and except as otherwise provided in this subtitle, the procedures to be followed by the court, shall be as specified in the Maryland Rules."
The applicable Maryland Rule, 11–114, in turn, provides in pertinent part:

"b. *Scheduling of hearing.* 1. *Adjudicatory hearing.* An adjudicatory hearing shall be held within sixty days after the juvenile petition is served on the respondent unless a waiver petition is filed, in which case an adjudicatory hearing shall be held within thirty days after the court's decision to retain jurisdiction at the conclusion of the waiver hearing. However, upon motion made on the record within these time limits by the petitioner or the respondent, the administrative judge of the county or a judge designated by him, for extraordinary cause shown, may extend the time within which the adjudicatory hearing may be held. The judge shall state on the record the cause which requires an extension and specify the number of days of the extension.
2. *Pre-hearing detention or shelter care.* If the respondent is in detention or shelter care, the adjudicatory hearing shall be held within thirty days from the date on which the court ordered continued detention or shelter care. If an adjudicatory hearing is not held within thirty days, the respondent shall be released on the conditions imposed by the court pending an adjudicatory hearing, which hearing shall be held within the time limits set forth in subsection 1 of this section."

11–114 provides for the release of any juvenile in detention unless an "adjudicatory hearing shall be held within thirty days from the date on which the court ordered continued detention or shelter care." In addition, that Rule also provides for the release of any juvenile not in detention or shelter care unless an "adjudicatory hearing shall be held within sixty days after the juvenile petition is served on the respondent...." Thus, Rule 11–114 provides protection against delayed juvenile adjudicatory proceeding in two specific circumstances: (1) to detained juveniles who are not given an adjudicatory hearing within thirty days of the court ordered detention or shelter care; and (2) to non-detained juveniles who are not given an adjudicatory hearing within sixty days after the petition is served upon them.

In the case *sub judice*, Thomas J. was not detained and the petition was not served on him until three years and four months after his arrest. The statutory and regulatory scheme fails to provide protection when an alleged juvenile is not detained and has no notice of a petition being filed. Simply because a court conducted an annual writ review and directed it to remain outstanding does not work to extend the time within which the adjudicatory hearing may be held, pursuant to Rule 11–114(b)(1). Indeed, as the respondent's Brief notes, "there was a delay of considerable length, sufficient to invoke a due process concern, but not one which was protected by the statute and rule." This belies the State's argument that the provisions of the MJCA ensure prompt adjudicatory hearings to juveniles. Consequently, we look to the Due Process Clause of the Fourteenth Amendment and Article 21 of the Maryland Declaration of Rights, for guidance.

## B.

The United States Supreme Court, albeit in the adult context, determined that a defendant may assert due process violations to challenge delay both before and after official accusation, because:

" 'Inordinate delay between arrest, indictment, and trial may impair a defendant's ability to present an effective defense. But the major evils protected against by the speedy trial guarantee exist quite apart from actual or possible prejudice to an accused's defense. To legally arrest and detain, the Government must assert probable cause to believe the arrestee has committed a crime. Arrest is a public act that may seriously interfere with the defendant's liberty, whether he is free on bail or not, and that may disrupt his employment, drain his financial resources, curtail his associations, subject him to public obloquy, and create anxiety in him, his family and his friends.' "

*United States v. MacDonald*, 456 U.S. 1, 7, 102 S.Ct. 1497, 1502, 71 L.Ed.2d 696, 703 (1982) (*quoting United States v. Marion*, 404 U.S. 307, 320, 92 S.Ct. 455, 463, 30 L.Ed.2d 468, 478 (1971)). By point of reference, the Due Process Clause of the Fourteenth Amendment provides, "nor shall any State deprive any person of life, liberty, or property, without due process of the law." U.S. Const. amend. XIV. In addition, a defendant in this state is afforded parallel protection through Articles 24 and 21 of the Maryland Declaration of Rights. Article 24 provides "[t]hat no man ought to be taken or imprisoned or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or, in any manner, destroyed, or deprived of his life, liberty or property, but by the judgment of his peers, or by the Law of the land." Article 21 guarantees a right "to a speedy trial. . . ."

Thomas J. asserts a violation of due process and speedy trial rights where his right to a prompt adjudication was delayed beyond three years. Moreover, he contends that "the statutory and regulatory control of juvenile proceedings is no more the exclusive guarantor of a juvenile's constitutional right to due process than is Md.Code (1957, 1996 Repl.Vol.), Art. 27, § 591 and Md. Rule 4–271 the exclusive guarantor of an adult's constitutional right to speedy trial." The State, however, points to *In re Gault, supra,* arguing that while the requirement of due process applies in juvenile proceedings, "only a showing of denial of due process warrants dismissal of

juvenile proceedings, and given that Thomas J. was not detained ... and was responsible for the delay," his rights were not violated.

Prior to *Gault,* proceedings involving juveniles were determined to be unique proceedings that were not subject to the provisions of either the state or federal constitutions applicable to criminal cases, and, thus, juveniles did not enjoy the attendant constitutional protections afforded in criminal prosecution of adults. *See Kent v. United States, supra,* 383 U.S. at 555, 86 S.Ct. at 1054, 16 L.Ed.2d at 94 (noting that in the juvenile proceedings, delinquents had not been entitled to bail, to indictment by grand jury, to a speedy and public trial, to trial by jury, to immunity against self-incrimination, to confrontation of their accusers, and in some jurisdictions, they are not entitled to counsel); *Ex parte Cromwell,* 232 Md. 305, 310, 192 A.2d 775, 778 (1963) (holding that failure to provide bail in juvenile proceedings was not a violation of the Federal Constitution). Then, in *Gault* a 15–year–old boy was committed as a juvenile delinquent to the Arizona State Industrial School for the period of his minority, unless sooner discharged by due process of law, by the Juvenile Court of Gila County, Arizona. The boy was taken into custody by the county sheriff without notice to his parents. Upon going to the children's detention home, where the boy was held, the boy's mother was orally advised that he was there for making an obscene telephone call and that a hearing would be held on the following afternoon in Juvenile Court. A petition filed on the hearing day, and not served on or shown to the boy or his parents, made no reference to the factual basis for the judicial action; stating only that the boy was a delinquent minor. The complainant was not present at the hearing, where no one was sworn. The officer stated that the boy admitted making the lewd remarks after questioning out of the presence of the juvenile's parents, without counsel, and without being advised of his right to silence; and neither the boy nor his parents were notified of the boy's right to be represented by counsel and of the right to appointed counsel if they could not afford a lawyer. *See*

*Gault,* 387 U.S. at 5–8, 87 S.Ct. at 1432–33, 18 L.Ed.2d at 533–536.

The Court began its decision by examining the historical development of the Juvenile Court system and concluded that "the early conception of the Juvenile Court proceeding was one in which a fatherly judge touched the heart and conscience of the erring youth by talking over his problems, by paternal advice and admonition," but now the "appearance as well as the actuality of fairness, impartiality and orderliness—in short, the essentials of due process—may be a more impressive and more therapeutic attitude so far as the juvenile is concerned." *Id.* at 25–26, 87 S.Ct. at 1442–43, 18 L.Ed.2d at 545. Of additional importance to the Court was the determination that previous:

> "Failure to observe the fundamental requirements of due process has resulted in instances, which might have been avoided, of unfairness to individuals and inadequate or inaccurate findings of fact and unfortunate prescriptions of remedy. Due process of law is the primary and indispensable foundation of individual freedom. It is the basic and essential term in the social compact which defines the rights of the individual and delimits the powers which the state may exercise. As Mr. Justice Frankfurter has said: 'The history of American freedom is, in no small measure, the history of procedure.' But in addition, the procedural rules which have been fashioned from the generality of due process are our best instruments for the distillation and evaluation of essential facts from the conflicting welter of data that life and our adversary methods present. It is these instruments of due process which enhance the possibility that truth will emerge from the confrontation of opposing versions and conflicting data. 'Procedure is to law what "scientific method" is to science.' "

*Id.* at 19–21, 87 S.Ct. at 1439–40, 18 L.Ed.2d at 541–42. (Footnotes omitted).

The *Gault* Court then held that "delinquency" determinations within a state juvenile court proceeding "must measure

up to the essentials of due process and fair treatment." *Id.* at 30, 87 S.Ct. at 1445, 18 L.Ed.2d at 548. Moreover, the Due Process Clause of the Fourteenth Amendment requires states to observe certain fundamental rights in connection with juvenile court proceedings. In so holding, the *Gault* Court specifically acknowledged that the right to written notice of the specific charge(s) in advance of the hearing; notification of the right to counsel, and to appointed counsel in case of indigence; the privilege against self-incrimination; and the right to a hearing based on sworn testimony, with the corresponding right of cross-examination were constitutionally protected rights within state juvenile proceedings.

In *In re Winship*, 397 U.S. 358, 364, 90 S.Ct. 1068, 1073, 25 L.Ed.2d 368, 375 (1970), the Court extended the *Gault* holding when it held that the Due Process Clause of the Fourteenth Amendment requires that the proof beyond a reasonable doubt standard, applicable in adult criminal cases, must be applied in the adjudication stage of juvenile proceedings. For an inapposite application, however, *see McKeiver, supra,* 403 U.S. at 545, 91 S.Ct. at 1986, 29 L.Ed.2d at 661, where the Court held that a defendant does not have a constitutional right to a jury in juvenile proceedings. Of particular importance to the Court was the determination that because of the impact a constitutionally required jury would have on juvenile proceedings, "fundamental fairness" did not require a jury trial. *Id.* at 543–51, 91 S.Ct. at 1985–89, 29 L.Ed.2d at 659–64.

To be sure, the holdings of *Gault* and *Winship* teach that the "applicable due process standard in juvenile proceedings . . . is fundamental fairness." *Id.* at 543, 91 S.Ct. at 1985, 29 L.Ed.2d at 659. The Court reiterated that, as the standard is applied, the emphasis is on fact-finding procedures. *Id.* The constitutional protections made applicable to juvenile proceedings by *Gault* and *Winship* (i.e., notice, counsel, confrontation, cross-examination and standard of proof) naturally flowed from this emphasis. Noticeably absent, however, from the *Gault* decision, and its progeny, is the extension of the constitutional right to a speedy trial, guaranteed in criminal pro-

ceedings, to juvenile proceedings. As we see it, our federal constitutional inquiry should determine whether the asserted right to a prompt hearing and adjudication, analogous to a speedy trial guaranteed by the Sixth Amendment, is among the "essentials of due process and fair treatment" required by *Gault?*

The United States Supreme Court has yet to address this issue. Moreover, this Court has never considered the question of whether a juvenile has a constitutional right to a speedy trial,[2] although we have considered the related, though distinct question of the appropriate sanction for violation of statutes and rules setting time limits in juvenile proceedings. *See In re Anthony, supra,* 362 Md. 51, 763 A.2d 136. In *In re Anthony,* we held that a statute of limitations for a misdemeanor offense in adult proceedings also applies to juvenile proceedings. *Id.* at 73, 763 A.2d at 148. Taking note that the issue in *In re Anthony* was one of first impression in Maryland, this Court stated that "other jurisdictions have statutes that make the general statute of limitations for offenses applicable to juvenile proceedings or their courts have held that the statute of limitations for criminal offenses are applicable in juvenile proceedings." *Id.* at 71, 763 A.2d at 147. Relying upon the cases from our sister jurisdiction, Judge Cathell, writing for this Court stated:

> "[w]e hold that, in juvenile proceedings, where the offense would be a misdemeanor under the purview of section 5–106(a) in an adult criminal proceeding, section 5–106(a) applies to juvenile proceedings, unless there is some other statute providing a different period of limitations, in which event the different statute applies in juvenile proceedings." [3]

*Id.* at 73, 763 A.2d at 148.

We commence our analysis of whether a prompt hearing and adjudication in a juvenile proceeding is among the "essen-

---

**2.** The Court of Special Appeals, however, has dealt with the matter. *See Berryman v. State,* 94 Md.App. 414, 617 A.2d 1120 (1993).

**3.** *People In the Interest of M.T.* 950 P.2d 669, 670–71 (Colo.App.1997) ("the juvenile court may retain jurisdiction over a juvenile until all

tials of due process and fair treatment" by reviewing the case law of our sister jurisdictions. Our review reveals that many of our sister jurisdictions have extended the constitutional right to a speedy trial to youthful offenders in juvenile proceedings. In *Commonwealth v. Dallenbach*, 1999 Pa. Super 101, 729 A.2d 1218 (1999), for example, a juvenile had his hearing postponed, resulting in an eighteen month delay following the filing of the juvenile petition. There, the court opined:

"The relative informality of juvenile proceedings, as compared to the rigidity of the rules of the adversarial criminal system, reflects the differing goals of the juvenile system, reformation and rehabilitation, as opposed to punishment and retribution. The role of the state as *parens patriae* for the juvenile in delinquency proceedings further emphasizes the contrast in goals of the two systems. The state's role as protector does not eliminate the juvenile's rights to a 'fundamentally fair' proceeding under the due process clause. Rather, in its protective role the state must consider the importance of time in a developing child's life in attempting to fashion a successful rehabilitation program for each juvenile. As the juvenile years are marked with significant changes and rapid development, children experience an acceleration in the passage of time so that, to a juvenile, one year may seem to be five. To ensure successful rehabilita-

---

orders have been fully complied with by such person, or any pending cases have been completed, or the statute of limitations applicable to any offense which may be charged has run, regardless of whether such person has attained the age of eighteen years, and regardless of the age of such person"); *State v. J.C.*, 677 So.2d 959, 960 (Fla Dist.App. 2nd Dist.1996); *State v. Gammon*, 519 A.2d 721, 722 (Me.1987) ("Limitations upon the commencement of prosecution against a juvenile shall be the same as those provided for adults...."); *State in the Interest of B.H.*, 112 N.J.Super. 1, 5, 270 A.2d 72, 74 (1970) ("The defense of the statute of limitations, being substantive, should be available to juveniles where the complaint alleges the commission of an adult criminal or penal offense."); *In the Matter of G.M.P.*, 909 S.W.2d 198, 204 (Tex. App. Houston 1995) (The State may prove that the offense was committed before, on, or after the alleged date, provided the date proved is a date prior to the date of the indictment, and is within the statute of limitations).

tion, the reformation program (including punishment) must commence within a reasonable time of the child's delinquent act so that the child can comprehend the consequences of his act and the need for reform. As a result, the concept of 'fundamental fairness' in juvenile proceedings would seem to require that at least some limit be placed on the length of time between the delinquent act and the case disposition, including any associated punishment."

The court formally held that the right to a speedy trial applied to juvenile proceedings. *Dallenbach, supra,* 729 A.2d at 1222.

*See also In re P.V.,* 199 Colo. 357, 359–60, 609 P.2d 110, 111 (1980) (citing to prior decisions that held that certain judiciary created rules and legislative enactments which are premised on fundamental constitutional rights must, as a matter of fundamental fairness, be applied to juveniles and holding that a statute requiring a speedy trial for adult offenders be applied to juveniles); *Piland v. Clark County Juvenile Court Services,* 85 Nev. 489, 492, 457 P.2d 523, 524–525 (1969) (holding that although *Gault* does not expressly enumerate the right to a speedy trial as one of the safeguards of due process, the right is axiomatic to the mandates announced in *Gault* and to rule otherwise would emasculate the safeguards that were expressly enumerated: adequate notice of hearing, right to counsel, right to cross-examination of witnesses and privilege against self-incrimination—and that to hold otherwise the youthful offender might never be provided a forum in which to enjoy the basic rights of due process specifically granted in *Gault* ). *See generally, In re R.D.F.,* 266 Ga. 294, 301, 466 S.E.2d 572 (1996) (Carley J., concurring) (noting that *Gault* "required in appropriate situations the same constitutional standards apply to juveniles as to adults.").

*In re D.H.,* 666 A.2d 462 (D.C.App.1995) (Wagner, C.J.), is also instructive. There, the court was concerned with the defendant's argument that "the twenty-one month interval between the date of the homicide and the trial violated his due process right to a speedy trial in that the delay prejudiced his ability to present an adequate defense and deprived him of the benefit of rehabilitation in the juvenile system." *Id.* at 465.

After noting the contentions of the parties, Chief Judge Wagner determined that "[a] primary goal of the juvenile system is protection of the child through treatment and rehabilitation, a goal best achieved by prompt disposition directed toward effectuating it," and that "the right of the juvenile in the system to a speedy hearing and disposition, consistent with the statutory purpose, requires due process protection." *Id.* at 472–73. Following courts from other jurisdictions, (*i.e., In re Interest of C.T.F.,* 316 N.W.2d 865, 868 (Iowa 1982); *In re Welfare of J.D.P.,* 410 N.W.2d 1, 3 (Minn.App.1987)), the court then held "that a child has a due process right to a fair trial, including a speedy one, consistent with the statutory purpose of the juvenile code,[4] and consonant with the protection of the child and the community." *In re D.H.,* 666 A.2d at 473. Ultimately, however, the Court applied the Sixth Amendment balancing test identified in *Barker, supra,* to find that the defendant's due process rights were not violated.[5] *See also In re J.J.,* 521 N.W.2d 662, 668 (S.D.1994) (applying the *Barker* factors after holding that the Due Process clause of the Fourteenth Amendment and Article VI, § 7, of the South Dakota Constitution, provide juveniles with the right to a speedy trial); *In re C.T.F.,* 316 N.W.2d 865, 868 (Iowa 1982) (determining "that the *Gault* due process test should be applied ... [because] ... fundamental fairness requires that juveniles have the right to a speedy trial," but concluding that, although the *Barker* test is applicable under the Sixth Amendment, it "is appropriate for determining whether a juvenile

---

**4.** The court noted that "Congress identified its purposes to be the protection of the community and the child through treatment and rehabilitation," and that the "time provisions are not mandatory ... a point further buttressed by the legislative history of the juvenile code." *In re D.H.,* 666 A.2d at 470.

**5.** The court found particularly telling the fact that the defendant claimed prejudice but could not make "any proffer showing how any unavailable, unknown witnesses would have aided his defense nor any efforts that he has made to identify them otherwise," and the fact that the defendant "[a]t the time of the commission of the offense and at the time that the case was dismissed initially ... was already a committed juvenile, and he had another case pending ... [and] was arrested ... in an unrelated case...." *In re D.H.,* 666 A.2d at 475–76.

has been denied the right to a speedy trial under the applicable due process provisions of both the federal and Iowa constitutions.").

We have stated, *supra*, that the *Gault* fundamental fairness standard requires that we emphasize its application in the fact finding process. We note that one of the significant justifications for a speedy trial in the criminal proceeding is the safeguarding of the fact-finding process, *see Barker, supra*, 407 U.S. at 521, 92 S.Ct. at 2187 ("[a]s the time between the commission of the crime and trial lengthens, witnesses may become unavailable or their memories may fade"). As the Supreme Court of Nevada made clear, without a speedy trial, "a youthful offender might never be provided a forum in which he could enjoy the basic rights of due process specifically granted in *Gault.*" *Piland v. Clark County, supra*, 85 Nev. at 492, 457 P.2d at 525. Inasmuch as the rights (adequate notice of hearing, right to counsel, right to cross-examination of witnesses, privilege against self-incrimination and burdens of proof) specifically acknowledged by *Gault* and its progeny were determined to stem from fundamental fairness, this Court finds the right to a speedy trial in a juvenile proceeding to be consistent with the protections enumerated in *Gault.* We therefore hold, as a matter of fundamental fairness, that the Due Process Clause of the Fourteenth Amendment and Article 21 of the Maryland Declaration of Rights require that juveniles be afforded a speedy trial. We decline to engage in rule making by stating a specified period that would result in a violation of the right. Consequently, we rely on our case law to determine whether Thomas' constitutional due process right to a speedy trial has been violated in this case.

### III.

The test identified by the Supreme Court in *Barker v. Wingo*, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972), as adopted by this Court for the determination of whether violations of a criminally accused's right to a speedy trial in this state, *see Divver v. State*, 356 Md. 379, 388, 739 A.2d 71, 76 (1999), has been violated, provides the standard as to the

application of speedy trial principles to a prompt adjudicatory hearing. When presented with the similar issue, courts in our sister states have arrived at consistent results—the *Barker* Sixth Amendment test is applicable to juvenile proceedings. For example, in *Dallenbach* the court extended the "fundamental fairness" doctrine and held, "[a]fter careful consideration ... the due process clause of the 14th Amendment makes applicable to juveniles a 6th Amendment speedy trial right in delinquency proceedings." *Dallenbach, supra,* 729 A.2d at 1222. The court then applied the four *Barker* factors and determined that, although the delay in the case was unreasonable, on remand the trial court must find "actual prejudice." *Id.* at 1226.

To like effect, *P.V. v. District Court,* 199 Colo. 357, 360, 609 P.2d 110, 112 (1980), noted that the purposes behind the speedy trial rule are more important to juveniles than to adults:

"It is our view that the speedy resolution of juvenile proceedings brings about more significant benefits to a child and to society than are accrued through application of speedy trial rules in adult proceedings. Certainly the average juvenile is far more vulnerable to psychological harm during the pretrial period than be the average adult would be. In addition, it cannot be denied that a juvenile suffers equally with an adult when the delay of proceedings impairs his ability to present his defense."

The court then applied the four *Barker* factors:

"In order to determine whether the constitutional right to a speedy trial has been violated, it is necessary to make an *ad hoc* judgment based on the facts of each case. Factors to be considered include length of delay, the reason for the delay, defendant's assertion of the right, and any prejudice to the defendant. Necessarily, this *ad hoc* balancing process is difficult and lacking in mathematical precision."

*P.V.,* 199 Colo. at 361–62, 609 P.2d at 112–13.

Similarly, the Supreme Court of Iowa determined:

"Charging a juvenile with a delinquent act results in family stress and causes concern and anxiety on the part of the juvenile. It often affects the juvenile's relationships with peer groups, school officials, and other adult authorities. Also, unreasonable delay may affect the quality and quantity of evidence presented, impairing the juvenile's defense and preventing a fair hearing. Finally, in the event the juvenile is found to have committed the delinquent act, the delay may be detrimental to the youth's rehabilitation.

\* \* \* \* \* \*

"We believe the *Barker* test is appropriate for determining whether a juvenile has been denied the right to a speedy trial under the applicable due process provisions of both the federal and Iowa constitutions. Its application, however, should take into consideration the differences between adult criminal prosecutions and juvenile delinquency proceedings."

*In the Interest of C.T.F.*, 316 N.W.2d 865, 868–69 (Iowa 1982).

We too adopt the *Barker* test in order to determine whether the respondent's constitutional right to a speedy trial has been violated in the case *sub judice*.

In *Barker*, the United States Supreme Court adopted a four-part balancing test to determine whether an accused has been denied the right to a speedy trial under the Sixth Amendment. The factors identified to be considered are: (1) the length of delay; (2) the reason for the delay; (3) the assertion of the right to a speedy trial by the accused; and (4) the prejudice to the accused resulting from the delay. *See Barker*, 407 U.S. at 530–532, 92 S.Ct. at 2192–2193, 33 L.Ed.2d at 117–118; *Divver, supra*, 356 Md. at 388, 739 A.2d at 76. "Until there is some delay which is presumptively prejudicial, there is no necessity for inquiry into the other factors that go into the balance." *State v. Henson*, 335 Md. 326, 333, 643 A.2d 432, 435 (1994) (*quoting Barker*, 407 U.S. at 530, 92 S.Ct. at 2192, 33 L.Ed.2d at 117). Once the existence of a presumptively prejudicial delay has been determined, "none of the four factors [is] either a necessary or sufficient condition ...

[r]ather they are related factors and must be considered together with such other circumstances as may be relevant." *Divver* at 394, 739 A.2d at 79 (*quoting Epps v. State*, 276 Md. 96, 107, 345 A.2d 62, 70 (1975) (*quoting Barker*, 407 U.S. at 533, 92 S.Ct. at 2193, 33 L.Ed.2d at 118)).

### 1. *Length of Delay*

■ As previously stated, the length of delay factor is a triggering mechanism and is not necessarily, in and of itself, sufficient to compel dismissal. What may seem, on its face, an outrageous delay may, indeed, be deemed reasonable. *See e.g., Barker*, 407 U.S. at 533–36, 92 S.Ct. at 2193–95, 33 L.Ed.2d at 118–120 (holding delay of five years not violative of constitutional right to speedy trial); *State v. Bailey*, 319 Md. 392, 415, 572 A.2d 544, 555 (1990) (deciding "the various periods of delay [amounting to two years and nine days] in this case do not mount up to a denial of any constitutional right."); *Wilson v. State*, 281 Md. 640, 651, 382 A.2d 1053, 1062 (1978) ("Applying the balancing test by assessing the four factors relevant in determining whether Wilson was deprived of his right to a speedy trial in the circumstances of the delay here, [four years and two months] the conclusion that he was not denied the right is crystal clear."); *cf. Epps*, 276 Md. at 111, 345 A.2d at 72 (delay of one year and fourteen days was "sufficiently inordinate to constitute a 'triggering mechanism' to engage in the 'sensitive balancing process' ").

■ "For speedy trial purposes the length of delay is measured from the date of arrest or filing of indictment, information, or other formal charges to the date of trial." *Divver* at 388–89, 739 A.2d at 76 (*citing State v. Gee*, 298 Md. 565, 569, 471 A.2d 712, 714 (1984)). In the case *sub judice*, the date of arrest was January 18, 1996 and the date on which the writ was returned was April 22, 1999. Thus, the delay of three years and four months raises a presumption of prejudice and is of sufficient duration to trigger a consideration of the remaining three elements of the *Barker* analysis.

2. *Reason For Delay*

▉ "Closely related to length of delay is the reason the government assigns to justify the delay ... [and] different weights should be assigned to different reasons." *Barker*, 407 U.S. at 531, 92 S.Ct. at 2192, 33 L.Ed.2d at 117. By way of guidance, the *Barker* Court provided:

"A deliberate attempt to delay the trial in order to hamper the defense should be weighed heavily against the government. A more neutral reason such as negligence or overcrowded courts should be weighed less heavily but nevertheless should be considered since the ultimate responsibility for such circumstances must rest with the government rather than with the defendant. Finally, a valid reason, such as a missing witness, should serve to justify appropriate delay."

*Id.* at 531, 92 S.Ct. at 2192, 33 L.Ed.2d at 117 (footnote omitted); *accord Divver*, 356 Md. at 391, 739 A.2d at 78; *Bailey*, 319 Md. at 412, 572 A.2d at 553.

In *Bailey*, 319 Md. at 412, 572 A.2d at 553 (*quoting Jones v. State*, 279 Md. 1, 6–7, 367 A.2d 1, 5–6 (1976)), this Court discussed "different weights" and "different reasons" when discussing reasons for delay. There we said:

" '[A] continuum exists whereby a deliberate attempt to hamper the defense would be weighed most heavily against the State, a prolongation due to the negligence of the State would be weighed less heavily against it, a delay caused by a missing witness might be a neutral reason chargeable to neither party, and a delay attributable solely to the defendant himself would not be used to support the conclusion that he was denied a speedy trial.' "

To be sure, we noted in *Divver, supra*, 356 Md. at 391–92, 739 A.2d at 78, that the delay of twelve months and sixteen days was attributable to the failure of the District Court to assign the case for trial earlier, and although that court was understaffed, "[a]ssigning cases for trial is the obligation of the State.... [and] the entire delay is weighed against the State ... although not as heavily as it would were this a case in

which the delay was purposeful, in order to hamper the defense."

In the instant case, the State asserts that the reason for the delay is "solely attributable to Thomas J. and his mother, who moved shortly after Thomas J.'s delinquent acts without providing notice of their new address." It contends that Thomas J. and his mother had an affirmative duty to notify the court of the change of address; Mrs. J. signed a form when Thomas J. was released into her custody, requiring notification of any change of address. Thomas J., however, asserts no such affirmative duty was present and that his mother properly notified the person with whom she was in contact, in a reasonable manner when she,

> "provided a change of address to the Post Office and the police, and gave the detective in the case information about where she worked, which remained unchanged after the move. With only minimal effort, Thomas argues, the State could have located him either by: (1) contacting his mother at work, or (2) searching the database of pupils within the Prince George's County school system in which Thomas remained after the move."

*In re Thomas J.,* 132 Md.App. at 405, 752 A.2d at 703. (Footnote omitted).

There is no evidence in the record of this case that the State intended to hamper the defense of the respondent. Nor is there any evidence that the respondent or his mother intended to hide from or elude the juvenile proceedings. But, there is an obligation of the State to at least attempt, in a reasonable manner, to locate alleged delinquents. The State's assertion that the writ serves as a warrant, especially in light of the goal of the juvenile statutory and regulatory scheme is not satisfactory. Indeed, as the respondent called attention to:

> "Minimizing the time between arrest and disposition in juvenile delinquency cases may be especially critical because of the nature of adolescence. The imposition of legal sanctions is essentially an attempt to teach offenders that illegal behavior has consequences and that anyone who violates the

law will be held accountable. In order to deliver this message effectively, the juvenile court process must fit the unique learning style of adolescents. During the years of adolescence, young people experience many developmental changes, and the passage of time is often accelerated—for example, three months of summer vacation may seem like an eternity to a fourteen-year-old. If the juvenile court takes too long to respond to youthful misbehavior, the corrective impact of the court process may be greatly curtailed."

Butts, Jeffrey A., *Speedy Trial in the Juvenile Court*, 23 Am. J.Crim. L. 515, 525 (1996).

Therefore, because the respondent reasonably kept in contact with the proper authorities and the State simply relied upon a writ, in lieu of contacting respondents' mother or school, we hold that "a prolongation due to the negligence of the State," *Bailey*, 319 Md. at 412, 572 A.2d at 553, would be weighed, albeit less heavily, against the State.

### 3. *Assertion of the Right*

"It is undisputed that Thomas [J.] never asserted his right to a speedy trial, but, rather, made a motion to dismiss at the adjudicatory hearing on May 20, 1999." *In re Thomas J.*, 132 Md.App. at 407, 752 A.2d at 704. Therefore, ordinarily, this "failure to assert the right will make it difficult for a defendant to prove that he was denied a speedy trial." *Barker*, 407 U.S. at 532, 92 S.Ct. at 2193, 33 L.Ed.2d at 118. But, "a defendant's failure to demand a speedy trial during the period when he was unaware of the charge, cannot be weighed against him." *Brady*, 288 Md. 61, 69, 415 A.2d 1126, 1130 (1980), *rev'd on other grounds, Brady v. State*, 291 Md. 261, 434 A.2d 574 (1981) (*"Brady II"*). Because there is no evidence that the respondent was aware that a delinquency petition had been filed, we shall not weigh this factor against him.

### 4. *Prejudice to the Accused*

 Prejudice, in respect to the right of a speedy trial, has been defined to include not merely an "impairment of defense" but [also] "any threat to what has been termed an accused's significant stakes, psychological, physical and financial, in the prompt termination of a proceeding which may ultimately deprive him of life, liberty or property." *U.S. v. Dreyer,* 533 F.2d 112, 115 (3rd Cir.1976). It is to be assessed in light of the interests that the speedy trial constitutional right was designed to protect. The *Barker* Court has expressly "identified three such interests: (i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired." *Barker,* 407 U.S. at 532, 92 S.Ct. at 2193, 33 L.Ed.2d at 118. We have also, *see Bailey, supra,* 319 Md. at 415, 572 A.2d at 555, *citing Brady v. State,* 288 Md. at 66, 415 A.2d at 1129, "made clear that *Barker* expressly rejected the notion that an affirmative demonstration of prejudice was necessary to prove a denial of the constitutional right to a speedy trial." As to the first interest, prevention of oppressive pretrial incarceration, the respondent was arrested and released into the custody of his mother, all on the same day of January 18, 1996. Thereafter, once the writ of attachment was served on April 2, 1999, Thomas J. was detained until his arraignment on April 22, 1999. He was then released into the custody of his mother once again. Therefore, like the intermediate appellate court, we do not believe that Thomas J. was oppressively incarcerated pending the outcome of the juvenile proceedings.

Regarding the second interest, minimizing the anxiety and concern of the accused, the lack of awareness of any outstanding charges may indicate that the accused was neither anxious nor concerned. We have, however, recognized that a "sudden awareness ... [of existing] charges which had been dismissed the year before, must have generated a response more than mere anxiety.... [Defendant] had to be frustrated." *Brady II,* 291 Md. at 268, 434 A.2d at 578. Here, as we have previously indicated, Thomas J. was unaware that a delinquen-

cy petition had been filed against him until he was served with the writ and suddenly detained for an incident that was over three years old. At the time that Thomas J. was arrested he was fourteen years of age and when the writ was served he was seventeen. Indeed, these three years are some of the most formative years in a person's life. As indicated in *In re Benjamin L.,* 92 N.Y.2d 660, 667, 685 N.Y.S.2d 400, 708 N.E.2d 156, 160 (1999), "[m]inimizing the time between arrest and disposition in juvenile delinquency cases may be especially desirable because of the nature of adolescence."

In the instant matter, minimizing the time between arrest and disposition, so as to prevent anxiety and psychological harm, was a goal chargeable to the State—one which it failed to discharge. Thomas J., however, has never expressly asserted the existence of anxiety or psychological harm. The lack of this assertion is telling, where we have stated a preference for particularity when claiming anxiety and concern. *See Bailey,* 319 Md. at 417, 572 A.2d at 556 (holding that bald assertion of anxiety and concern have little significance). To be sure, however, the lack of success of showing a violation of this interest is not dispositive, because of the three interests, "the most serious is the last. . . ." *Barker,* 407 U.S. at 532, 92 S.Ct. at 2193, 33 L.Ed.2d at 118.

Assessing the third interest, limiting the possibility that the defense will be impaired, we note that it speaks more to presumed prejudice, rather than the actual prejudice to a defendant's ability to present an effective defense. This is because actual prejudice can be difficult to prove. As the Court of Special Appeals noted, *In re Thomas J.,* 132 Md.App. at 411, 752 A.2d at 706–07, quoting the Court of Appeals of New York:

" 'In criminal cases, establishing actual prejudice may be a particularly difficult factor to prove in a speedy trial analysis due to the fact that time's erosion of exculpatory evidence and testimony 'can rarely be shown.' Determining whether the juvenile's defense is impaired due to a delay may be even more arduous. Typically, a juvenile released by a court with no direction to reappear is unlikely to

appreciate the importance of taking affirmative steps toward the ultimate resolution of the case, and is just as unlikely to possess the means and sophistication to do so.... In a criminal prosecution the sheer length of a delay is important because it is likely that 'all other factors being equal, the greater the delay the more probable it is that the accused will be harmed thereby.' The effects of that kind of delay in the juvenile context may be even more profound. A juvenile, experiencing the vicissitudes of childhood and adolescence, is more likely to suffer from a lack of memory than an adult. A juvenile is less likely than an adult to preserve his or her memory concerning the incident in question, his or her whereabouts on relevant dates, the identity of potential witnesses, and various other crucial details. Thus, there is an even greater potential for impairment of a juvenile's defense.' "

*In re Benjamin L.,* 92 N.Y.2d at 668–669, 685 N.Y.S.2d 400, 708 N.E.2d at 161 (internal citations and emphasis omitted).

This is one of the reasons why we have long recognized that a substantial delay gives rise to a presumption of prejudice. In *Bailey,* 319 Md. at 415, 572 A.2d at 555, we said that a delay of two years and nine days was presumptively prejudicial and "the presumption of prejudice always remains a factor to be weighed in the balance, because no one circumstance, such as the lack of actual prejudice, is controlling in deciding whether the defendant has been denied a speedy trial."

Our sister jurisdictions hold this view as well. *See e.g., Jackson v. State,* 272 Ga. 782, 786, 534 S.E.2d 796 (2000) (opining two year delay between arrest and date of trial was presumptively prejudicial); *Guajardo v. State,* 999 S.W.2d 566, 570 (Tex.App.1999) (construing a nearly five year delay as being presumptively prejudicial); *State v. Keating,* 285 Mont. 463, 471, 949 P.2d 251, 256 (1997) (holding a 270 day delay as presumptively prejudicial); *Tillmon v. State,* 676 A.2d 908 (Del.1995) (categorizing forty month delay as presumptively prejudicial); *In re J.J., supra,* 521 N.W.2d at 668 (determining delay between arrest and trial of nearly fourteen months was presumptively prejudicial); *State v. Austin,* 643 A.2d 798, 800

(R.I.1994) (deciding eighteen month delay was presumptively prejudicial); *State v. Tucker,* 132 N.H. 31, 32, 561 A.2d 1075, 1077 (1989) (interpreting ten month delay as presumptively prejudicial); *State v. Nihipali,* 64 Haw. 65, 68, 637 P.2d 407, 411 (1981) (finding delay of one year and three weeks presumptively prejudicial).

The United States Supreme Court has also recently affirmed that a presumption of prejudice increases with the length of delay. *See Doggett v. United States,* 505 U.S. 647, 655–56, 112 S.Ct. 2686, 2693, 120 L.Ed.2d 520, 531 (1992). In *Doggett,* the Government claimed that the petitioner failed to make any affirmative showing that the eight and one-half year delay weakened his ability to raise specific defenses, elicit specific testimony, or produce specific items of evidence. Holding that a petitioner could prevail on a speedy trial claim predicated upon presumed prejudice, the Supreme Court opined that:

> "*Barker* explicitly recognized that impairment of one's defense is the most difficult form of speedy trial prejudice to prove because time's erosion of exculpatory evidence and testimony 'can rarely be shown.' And though time can tilt the case against either side one cannot generally be sure which of them it has prejudiced more severely. Thus, we generally have to recognize that excessive delay presumptively compromises the reliability of a trial in ways that neither party can prove or, for that matter, identify. While such presumptive prejudice cannot alone carry a Sixth Amendment claim without regard to the other *Barker* criteria it is part of the mix of relevant facts, and its importance increases with the length of delay."

*Doggett,* 505 U.S. at 655–56, 112 S.Ct. at 2692–93, 120 L.Ed.2d at 531 (citations omitted)

The delay in the case *sub judice* of more than three years was presumptively prejudicial. Not only was the time period in excess of those found above, *i.e.,* from ten months to two years, but it was also identical to the time period of forty

months found presumptively prejudicial by the Delaware Supreme Court.

■ Based on the foregoing, we conclude that the Respondent's due process and speedy trial rights, as guaranteed by the Fourteenth Amendment of the United States Constitution and Article 21 of the Maryland Declaration of Rights, were violated when his juvenile proceeding was not adjudicated until three years and four months after his arrest.

JUDGMENT AFFIRMED, WITH COSTS.

HARRELL, J.

I respectfully dissent. I do not quarrel with the Majority with respect to: (1) its reasoning and conclusion extending to juvenile proceedings in Maryland constitutional due process speedy trial protection (Maj. op. at 57–72); (2) its reasoning and conclusion that the *Barker v. Wingo*[1] factors supply the appropriate analytical paradigm for consideration of a speedy trial issue in the juvenile proceeding context (Maj. op. at 70–73); or, indeed, (3) much of the Majority's weighing of the *Barker v. Wingo* factors on the record of the present case (for example, the "length of delay" (Maj. op. at 73) and "assertion of the right" (Maj. op. at 76) factors). I part company with the Majority, however, in its weighing and analysis of the remaining *Barker v. Wingo* factors and its resultant conclusion based on the record of this case.

The Majority's conclusion as to the weight to be accorded the facts under the "reason for delay" factor, although better sifted than in the Court of Special Appeals's opinion (which concluded that they should be weighted "heavily in Thomas's favor," 132 Md.App. at 404, 752 A.2d 699), should have resulted in a neutral conclusion, rather than one weighed against the State, "albeit less heavily" (Maj. op. at 76). In my view, both the State and Thomas J. shared equally the blame for the delay, to such an extent that I would not weigh this factor against either party.

---

1. *Barker v. Wingo*, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972).

At the 20 May 1999 hearing on Thomas J.'s motion to dismiss, no witnesses testified. The "facts" were proffered by Thomas J.'s attorney and the prosecutor and, without objection, accepted by the Court for purposes of the motion. No documentary exhibits were introduced or formally received in evidence, although the transcript reflects that the judge and counsel at times reviewed documents either in the court file or a party's file.[2]

The proffer by Thomas J.'s counsel was to the effect that Thomas and his mother moved from their residence on 23rd Parkway in Forest Heights to "another location within Prince George's County" three weeks after the offense was alleged to have been committed on 18 January 1996. As a consequence of the move, Thomas changed schools from Benjamin Stoddert Middle School to Andrew Jackson Middle School in Prince George's County. His mother, the judge was informed, would have claimed to have supplied her work telephone number to the police detective "in the case."[3] She also would have testified that she provided a change of address to the Post Office.[4,5]

Notwithstanding that Thomas J.'s mother wholly failed to notify the court directly of the change of residence address, as it appears she had agreed on 18 January 1996 to do, Respon-

---

2. In addition to the court form signed by Thomas J.'s mother on 18 January 1996 when he was released to her custody, reference was made to a summons mailed to the address given the court by Thomas J. and his mother on 18 January 1996. That summons was mailed on 28 May 1996 and returned by the Post Office with the notation "moved left no address; unable to forward."

3. The proffer did not include when she did this.

4. Again, the proffer was silent as to when the Post Office was so notified.

5. It is worth taking judicial notice that, at the pertinent times in this case, the U.S. Postal regulations provided that, unless requested otherwise, the Post Office forwards mail for 6 months to a change of address after notification. *See* 39 C.F.R. § 111.5 (Domestic Mail Manual, F020, § 1.1, Issue 55, 10 January 2000). If requested, the Post Office will forward mail up to 18 months after notice.

dent argues that it was entirely the State's fault that he was not located until 2 April 1999. He ventures that the State's Attorney failed to contact the police detective "in the case" to learn of the mother's work telephone number and failed to assign an investigator to check the County school system to find him. Indeed, the State may be faulted for merely sticking to routine gestures and "paper-pushing" in its efforts to bring Thomas J. to a prompt adjudication.

By the same token, Thomas J. and his mother were not models of civic responsibility. The Majority blesses the mother's efforts in "reasonably" keeping in contact with the proper authorities. Maj. op. at 76. The record does not support this characterization. The proffer to the juvenile court judge did not include when she notified the unnamed detective "in the case" or when she notified the Post Office of her change of address. Absent this chronological information, I fail to see how the label of reasonableness is so quickly bestowed. Of greater moment, however, is the question of whether the mother notified the Post Office of the address change at all. The return of the 28 May 1996 summons could be viewed as contradicting that assertion. If one assumed Thomas J.'s mother informed the Post Office on or about of the date of the move (some three weeks after 18 January 1996, or approximately 8 February 1996) and gave no instruction for a longer forwarding period, it could be inferred reasonably that the Post Office would forward her or Thomas J.'s mail through at least August 1996. *See* n. 5, *supra*. Yet, the Post Office returned the 28 May 1996 summons marked "unable to forward." Finally, common sense compels me to question whether a reasonable person, knowing that her child was subject to juvenile proceedings, would move and fail to notify the court of her new address (and her son's).

I do not purport to engage in fact finding regarding potentially disputed facts or inferences. My point is only that the weighing of the "reason for delay" factor should result in no prejudice to either party. There is more than enough blame on this score to share proportionately.

I also quarrel with the Majority's analysis of the "prejudice to the accused" factor (Maj. op. at 76–81), to the extent it posits some unexplained degree of weight against the State based on presumed prejudice to Thomas J. I agree that the record reflects no pre-adjudication incarceration, no anxiety or concern claimed by Thomas J., and no evidence that his defense was impaired by the delay. Nonetheless, the Majority apparently weighs this factor against the State solely on the ephemeral concept of presumed prejudice, which, on the record of this case, is a form without substance. The Majority leaps from legal abstracts (Maj. op. at 76–81) identifying the cases and courts that recognize the existence of this presumption to a conclusion that it exists in this case, premised solely on the duration of the delay. Even assuming this presumption applies here, largely because Thomas J. lost the potential benefits of a disposition under our juvenile system of justice when he was 14 years old (at the time of the misconduct) rather than at 17 when he was located and his case tried, I fail to see how the Majority, in a most conclusory fashion, races from there to the result of a constitutional violation (Maj. op. at 79–81).

According to my *Barker v. Wingo* "score card," Thomas J. has the better of the threshold "length of delay" and marginally the "prejudice" factors; however, the important "reason for delay" factor is a "push." The "assertion of the right" factor is concededly of no significance. On so thin a weighing, I would not find that his right to a speedy trial was abridged. Accordingly, I would reverse the judgment of the Court of Special Appeals.